STATE OF MINNESOTA                            DISTRICT COURT

COUNTY OF HENNEPIN                            FOURTH JUDICIAL DISTRICT

Case Type: Personal Injury

| | |
|---|---|
| Samantha Wright,<br><br>　　　　　　　　　Plaintiff,<br>　vs.<br>City of Minneapolis; Minneapolis Chief of Police Medaria Arradondo, in his individual and official capacity; State of Minnesota Department of Public Safety; Minnesota Department of Public Safety Commissioner John Harrington, in his individual capacity; Minnesota State Patrol Colonel Matthew Langer, in his individual capacity; and John Does 1-4, in their official and individual capacities,<br><br>　　　　　　　　　Defendants. | Civil File No. 27-CV-20-11495<br>Judge Jamie Anderson<br><br>FIRST AMENDED COMPLAINT<br>JURY TRIAL REQUESTED |

# INTRODUCTION

1. Samantha Wright, the plaintiff in this case, will have permanent eye damage because law enforcement officers – one or more of the John Doe Defendants – shot her with so-called "less lethal" projectiles during the George Floyd demonstrations in Minneapolis.

2. In the early morning hours of Saturday, May 30, 2020, Ms. Wright was a member of the protesting crowd near Lake Street and Nicollet Avenue in Minneapolis. She was not rioting, looting, or starting fires.

3. Yet law enforcement officers gratuitously struck her several times with "less lethal" projectiles, the last of which struck her left eye.

4. At issue in this case is Ms. Wright's irreparable injury and what orders were given to the law enforcement officers who targeted Ms. Wright and other protesters.

## PARTIES

5. Plaintiff Samantha Wright is a resident of Minneapolis, Minnesota.
6. Defendant City of Minneapolis is a municipality incorporated in the State of Minnesota.
7. Defendant Medaria Arradondo is a resident of Minnesota. Arradondo serves as the Chief of Police for the Minneapolis Police Department, and was at all times material herein responsible for training and supervising Minneapolis police officers.
8. Defendant State of Minnesota Department of Public Safety is an agency of the State of Minnesota that, on information and belief, employed one or more of the law enforcement officers who shot Ms. Wright with projectiles. Ms. Wright is only suing the State of Minnesota Department of Public Safety for Assault and Battery, the Fourth and Fifth causes of action below.
9. Defendant John Harrington is a resident of Minnesota. Harrington serves as the Minnesota Commissioner of Public Safety, and was at all times material herein responsible for training and supervising Colonel Matthew Langer and the Minnesota State Patrol.
10. Defendant Colonel Matthew Langer is a resident of Minnesota. Langer commands the Minnesota State Patrol, and was at all times material herein responsible for training and supervising the Minnesota State Patrol.
11. Defendants John Does are unidentified individuals who committed the acts set forth below as agents of Defendants City of Minneapolis and

the Minnesota State Patrol. Plaintiff is suing them in their official and individual capacities.

## JURISDICTION

12. This is an action for monetary and declaratory relief under 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction over this matter pursuant to Minn. Stat. § 484.01 *et seq.* Venue lies properly in Hennepin County, Minnesota pursuant to Minn. Stat. § 542.01 *et seq.*, as the events giving rise to this action occurred in Hennepin County.

## BACKGROUND

13. As tensions escalated in Minneapolis related to the murder of George Floyd by Minneapolis police officers, the Minneapolis Police Department and Minnesota State Patrol did not hesitate to respond by attacking protesters through the deployment of tear gas and "less-lethal" projectiles. When doing so, they did not provide warnings.

14. On May 26, 2020 – approximately three days before Plaintiff suffered permanent eye damage due to a projectile – in widely-publicized incidents, Minneapolis police officers shot projectiles at demonstrators during protests in Minneapolis.[1]

15. The City of Minneapolis and supervisory officials at its police department, including Defendant Arradondo, were on notice of these pre-existing violations of protesters' constitutional rights before Plaintiff was gratuitously shot with projectiles, in time to have

---

[1] *See, e.g.*, Evan Frost (@efrostee), Twitter, May 26, 2020, https://twitter.com/efrostee/status/1265445016710918148?s=20 (stun grenades), https://twitter.com/efrostee/status/1265446286297305090?s=20 (tear gas).

3

prevented it from happening through appropriate supervision and training.

16. On May 27, 2020 – approximately two days before Plaintiff suffered permanent eye damage due to a projectile – in widely-publicized incidents, Minneapolis police officers again shot projectiles at demonstrators during protests in Minneapolis.[2]

17. The City of Minneapolis and supervisory officials at its police department, including Defendant Arradondo, were on notice of these pre-existing violations of people's constitutional rights before Plaintiff was gratuitously shot with projectiles, in time to have prevented it from happening through appropriate supervision and training.

18. Command staff from both the Minnesota State Patrol and Minneapolis Police Department were in regular communication and coordination during the George Floyd protests regarding crowd control techniques, use of chemical agents and less-lethal ballistics and other crowd control technologies, and tactical deployment of officers and troopers, including the protest responses that resulted in the violation of constitutional rights described in this Complaint.

19. Defendants coordinated activities during the protests in part through the activities of the Multi-Agency Command Center ("MACC") set up to respond to the George Floyd protests. According to the Department of Public Safety, the MACC served as a unified command of federal, state, and local law enforcement and public safety agencies supporting the

---

[2] *See, e.g.*, Evan Frost (@efrostee), Twitter, May 27, 2020, https://twitter.com/efrostee/status/1265795992521228293?s=20 (stun grenades and tear gas), https://twitter.com/efrostee/status/1265817035881275396?s=20 (chemical irritant, stun grenades, and deterrent rounds), https://twitter.com/efrostee/status/1265815103561240582?s=20 (tear gas).

State's response to any unrest that developed following the death of George Floyd.

20. Agencies represented in the MACC included the Minnesota Department of Public Safety (State Patrol, Bureau of Criminal Apprehension, Alcohol and Gambling Enforcement, Division of Homeland Security and Emergency Management, State Fire Marshal Division, Minnesota State Patrol); National Guard; and Minneapolis Police Department.

21. According to July 9, 2020 legislative testimony from Commissioner Harrington, functional control of all law enforcement responding to the protests devolved to the Department of Public Safety and ultimately to Commissioner Harrington, with the sole exception of the Minneapolis police.

22. According to Commissioner Harrington, the State Patrol and other agencies under command of the Department of Public Safety acted "in concert" with the Minneapolis Police Department.  The Minneapolis Police Department "was not able to dictate missions to the State Patrol," but they were able to make requests.  Commissioner Harrington and his staff would then vet the requests and inform the Minneapolis Police Department if it could take on the requested mission. Senior officials from the Minneapolis Police Department were always present at the MACC to facilitate coordination with the State Patrol and the other state agencies minute-by-minute as the protests unfolded.

23. Like their command staff, Minneapolis Police Department officers and State Patrol troopers at the protest scenes worked literally side-by-side and in coordination in responding to the George Floyd protests.

5

24. On information and belief, law enforcement officers with the Minneapolis Police Department and the Minnesota State Patrol fired the projectiles that struck Ms. Wright.

25. These projectiles were fired in a manner contrary to the manufacturers' warnings and in contravention of Minneapolis Police Department and Minnesota State Patrol written policies on the use of force.

## MS. WRIGHT'S INJURIES

26. Being shot in the eye with a projectile has permanently altered Ms. Wright's life.

27. Ms. Wright's left eye orbital socket was shattered and she had to get stitches on her eyebrow.

28. Ms. Wright had bleeding in her eyeball, increased pressure, and her pupil will now stay dilated permanently.

29. Ms. Wright needed surgery to have a metal plate inserted in her face.

30. As Ms. Wright must continue to heal and learn to adapt to a new way of life, she does not anticipate returning to anything approaching her usual work life for at least three months from the date the injury occurred.

## *MONELL* AND SUPERVISORY ALLEGATIONS

31. Defendants have established policies, practices, and/or customs of using excessive force in violation of the constitutional rights of people participating in protests, specifically the George Floyd protests, and such policies, practices, and/or customs caused or contributed to the violation of Plaintiff's rights discussed in this Complaint.

32. Defendants have also failed to train or supervise their officers, agents, and employees to an extent that amounts to "deliberate indifference" to the rights of people participating in protests, specifically the George

6

Floyd protests, and this caused or contributed to the violation of Plaintiff's rights discussed in this Complaint.

33. In addition, the Minneapolis Police Department has a policy, practice, or custom referred to as a "code of silence," which has made it obvious to Minneapolis police officers that it is highly unlikely they will be disciplined in a meaningful way, much less terminated, for using excessive force on people participating in protests, especially during the George Floyd protests where it was difficult for protesters to determine which agency each law enforcement officer was employed by, all of which contributed to the unlawful acts of violence against Ms. Wright.

34. Not only are Minneapolis police officers routinely not disciplined when they use excessive force but fail to truthfully report this unauthorized use of excessive force (or fail to cooperate with investigations into fellow officers); the Minneapolis Police Officers Federation ("the Federation") actively encourages them not to truthfully report the unauthorized use of excessive force, and not to cooperate with investigations into fellow officers.

35. There has been no training or supervision by the City of Minneapolis and Defendant Arradondo that has been sufficient to curb this allegiance to the "code of silence" by Minneapolis police officers and the Federation.

36. Consequently, Federation members know that they can act in the above-described ways, especially in protest situations where it is difficult for protesters to determine who used force or which agency the law enforcement officer who used force was employed by, and be shielded from accountability.

37. The failures of the City of Minneapolis and Chief Arradondo to effectively train or supervise such officers for this conduct – the failure to truthfully report the unauthorized use of excessive force, and the failure to cooperate with investigations into fellow officers – emboldened Minneapolis police officers to act without regard for the rights of protesters during the George Floyd protests, and were a moving force behind the deprivation of Plaintiff's constitutional rights.

38. In addition, Minneapolis police officers have been instructed by the Federation not to aid in investigations into other officers, and officers have followed that instruction.

39. On information and belief, neither the State Patrol nor the Minneapolis Police Department have reprimanded, disciplined, or suspended any officer involved in any of the unlawful conduct described in this Complaint, nor has any additional training or supervision been implemented to prevent similar incidents in the future.

## FIRST CAUSE OF ACTION
*Retaliatory Use of Force in Violation of 42 U.S.C. § 1983 and the First and Fourteenth Amendments*
*Against John Does 1-4*

40. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

41. Plaintiff was attempting to exercise her First Amendment rights to free speech and the right to peacefully assemble on May 30, 2020.

42. The John Doe Defendants repeatedly used excessive force against Plaintiff in retaliation for her attempt to exercise her First Amendment rights.

43. The John Doe Defendants lacked probable cause to use such force against Plaintiff.

8

44. The John Doe Defendants' retaliatory use of force violated Plaintiff's constitutional rights.

45. The John Doe Defendants acted under color of law.

46. The John Doe Defendants' unlawful retaliatory use of force was willful and recklessly indifferent to the constitutional rights of Plaintiff as evidenced by the repeated violations of the constitutional rights of Plaintiff and other protesters.

47. Plaintiff suffered a permanent physical injury as a direct and proximate result of the John Doe Defendants' violations of her First Amendment rights.

48. The John Doe Defendants are jointly and severally liable to Plaintiff.

## SECOND CAUSE OF ACTION
*Excessive Force in Violation of 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments*
*Against John Does 1-4*

49. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

50. The John Doe Defendants' use of the aforementioned tactics against nonviolent protesters, such as firing "less-lethal" projectiles at Plaintiff, violated Plaintiff's Fourth Amendment rights.

51. Plaintiff was not posing a threat to the safety of the John Doe Defendants or others, had not committed any severe or violent crime, and was neither actively resisting arrest nor attempting to evade arrest by flight. In light of the relationship between the need, if any, for the use of force to the amount of force used, (1) the extent of the injuries to Plaintiff, (2) the inadequacy of the efforts, if any, by the John Doe Defendants to temper or limit the amount of force used against protesters (including Plaintiff), (3) the absence of a security problem

9

posed by Plaintiff, (4) the absence of conduct from Plaintiff that was capable of being reasonably perceived by the John Doe Defendants as a threat, and (5) the absence of efforts by the John Doe Defendants to arrest Plaintiff met with active resistance, the John Doe Defendants' use of excessive force against Plaintiff was objectively unreasonable.

52. The John Doe Defendants acted under color of law.

53. The John Doe Defendants' actions constituted an unlawful seizure in violation of Plaintiff's Fourth Amendment rights.

54. The John Doe Defendants violated Plaintiff's Fourth Amendment rights by shooting less-lethal projectiles at Plaintiff, without forewarning, while Plaintiff attended a George Floyd protest.

55. The John Doe Defendants willfully engaged in this unconstitutional conduct.

56. As a direct and proximate result of the John Doe Defendants' violations of Plaintiff's constitutional rights, Plaintiff has suffered a permanent physical injury.

### THIRD CAUSE OF ACTION
*Civil Conspiracy in Violation of 42 U.S.C. § 1983*
*Against John Does 1-4*

57. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

58. The John Doe Defendants conspired, under color of law, to deprive Plaintiff of her First and Fourth Amendment rights.

59. The John Doe Defendants acted in concert and committed overt acts in furtherance of the conspiracy. One or more John Doe Defendants repeatedly used excessive force to interfere with Plaintiff's attempt to exercise constitutionally protected rights.

60. The John Doe Defendants coordinated with one another prior to and during the George Floyd protests regarding their response to the protests. As described above, the John Doe Defendants engaged in overt acts in furtherance of their conspiracy to violate the constitutional rights of protesters, including Plaintiff, and these overt acts injured Plaintiff.

61. The John Doe Defendants violated Plaintiff's First and Fourth Amendment rights by using excessive force in retaliation for her attempt to exercise First Amendment rights, and by improperly reporting or not reporting that force with the intent to shield the officer(s) who shot the projectiles that injured Plaintiff.

62. The John Doe Defendants committed this misconduct maliciously or with reckless disregard for whether Plaintiff's rights would be violated.

63. Plaintiff suffered a permanent physical injury as a direct and proximate result of the John Doe Defendants' conspiracy to violate her constitutional rights.

## FOURTH CAUSE OF ACTION
### *State Law Claim – Assault*
### *Against City of Minneapolis, State of Minnesota Department of Public Safety, and John Does 1-4*

64. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

65. The John Doe Defendants' use of excessive, unprovoked, and unreasonable force to prevent Plaintiff from attempting to exercise her constitutional rights was intended to cause imminent harmful and offensive contact.

66. Plaintiff had a reasonable apprehension and fear that law enforcement firing "less lethal" projectiles would and did occur.

11

67. The John Doe Defendants had the apparent ability to cause Plaintiff harm.

68. The John Doe Defendants' actions were unlawful and unjustified.

69. As a direct and proximate result of these actions, Plaintiff suffered a permanent physical injury.

## FIFTH CAUSE OF ACTION
### *State Law Claim – Battery*
### *Against City of Minneapolis, State of Minnesota Department of Public Safety, and John Does 1-4*

70. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

71. The John Doe Defendants intentionally caused harmful or offensive contact with Plaintiff by using excessive force to prevent Plaintiff from attempting to exercise her constitutional rights. The John Doe Defendants fired "less-lethal" projectiles, causing permanent damage to Plaintiff's left eye.

72. As a direct and proximate result of the John Doe Defendants' actions, Plaintiff suffered a permanent physical injury.

## SIXTH CAUSE OF ACTION
### *Supervisory Liability*
### *Against Defendants Arradondo, Harrington, and Langer*

73. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

74. Defendants Medaria Arradondo, John Harrington, and Matthew Langer, at all times material hereto, had supervisory responsibilities over Defendants John Does 1-4, and had actual knowledge of improper reporting by Defendants John Does 1-4 regarding the use of force

12

against Ms. Wright and/or in other similar incidents, amounting to a policy or custom of constitutional misconduct.

75. These supervisory Defendants, under color of state law, acted unreasonably or with deliberate indifference to, authorized, or acquiesced in the violation of Plaintiff's constitutional rights by Defendants John Does 1-4.

76. As a direct and proximate result of the acts and omissions of these supervisory Defendants, Ms. Wright suffered harm, and was forced to endure great pain and mental suffering.

## SEVENTH CAUSE OF ACTION
### *Civil Rights Violations – Monell v. Dept. of Social Services*
### *Against Defendants City of Minneapolis and Arradondo*

77. Plaintiff restates the allegations contained in the previous paragraphs as if fully set forth herein.

78. Before May 30, 2020, Defendants City of Minneapolis and Arradondo, with deliberate indifference to the rights of protesters including Plaintiff, initiated, tolerated, permitted, failed to correct, promoted, and/or ratified a custom, pattern, or practice on the part of Minneapolis police officers, including the John Doe Defendants herein, of deliberate indifference toward the use of excessive force, which is manifested in the failure to adequately investigate excessive force, failure to adequately train investigators, and failure to discipline officers.

79. Through Defendants City of Minneapolis and Arradondo, and with their agencies' ratification and approval, by failing to train, supervise, and discipline all officers consistently on this point, there has been an approval of a deficient policy, custom, or practice of the improper use of force, including potentially deadly force, with regard to protesters, especially those at George Floyd protests.

13

80. These Defendants acted with deliberate indifference to the constitutional rights of protesters as evidenced by the recurring use of excessive force against them, both during and before the George Floyd protests.[3]

81. These Defendants have a custom and practice of targeting protesters, especially the people who attended George Floyd protests, by using excessive force (including "less-lethal" projectiles) without justification or warning, and while at close range. A pre-existing pattern of such violations put these Defendants on notice that a course of training or supervision was deficient in a particular respect.

82. These Defendants failed to supervise, train, and correct this wrongful conduct. Indeed, these Defendants failed to supervise, train, and correct the use of objectively unreasonable force against protesters even after reports of this violative conduct circulated widely. This policy, practice, or custom was the moving force behind the constitutional violations that harmed Plaintiff.

83. This policy, practice, or custom evidences these Defendants' deliberate indifference to violations of the constitutional rights of protesters, including Plaintiff.

---

[3] *See, e.g.*, Liz Sawyer and Libor Jany, *Complaints skyrocket over police response to George Floyd protests*, Star Tribune, July 2, 2020, https://www.startribune.com/complaints-skyrocketing-in-wake-of-mpls-police-response-to-floyd-protests/571608232/ ("Some of the criticism leveled at the [Minneapolis Police Department] echoed complaints made after the 18-day occupation of the Fourth Precinct police station that followed the 2015 killing of Jamar Clark. A federal after-action report found numerous instances in which officers used 'less-lethal and nonlethal weapons' on protesters during the occupation, in clear violation of department policies, and often failed to document their actions. Federal officials also recommended that the department 'strengthen, train on, adhere to and enforce the use of force policy . . . .'").

84. These Defendants' failure to train, supervise, or discipline regarding protesters' First and Fourth Amendment rights, even after many constitutional violations came to light, also evidences the deliberate indifference of these Defendants described above.

85. Plaintiff's injuries were directly and proximately caused by the aforementioned acts and omissions and by these Defendants' policies, practices, and/or customs.

## REQUEST FOR RELIEF

Plaintiff requests relief as follows:

1. A declaration that Defendants' use of excessive force against Plaintiff violated the First and Fourth Amendments;
2. Damages compensating Plaintiff for her injuries against all Defendants, jointly and severally, in an amount greater than $50,000;
3. Punitive damages;
4. Prejudgment interest;
5. Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and
6. Such other further relief as this Court may deem just and proper.

Dated: October 9, 2020

_____
Tim Phillips (#390907)
Law Office of Tim Phillips
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, Minnesota 55401
Phone: (612) 470-7179
Email: tim@timphillipslaw.com

**ATTORNEY FOR PLAINTIFF**

## ACKNOWLEDGEMENT REQUIRED BY MINN. STAT. § 549.211

Plaintiff, through undersigned counsel, acknowledges that sanctions, attorneys' fees, and witness fees may be imposed under Minn. Stat. § 549.211.

Dated: October 9, 2020

_____
Tim Phillips (#390907)
Law Office of Tim Phillips
331 Second Avenue South, Suite 400
TriTech Center
Minneapolis, Minnesota 55401
Phone: (612) 470-7179
Email: tim@timphillipslaw.com

**ATTORNEY FOR PLAINTIFF**